Argued November 28, 1940; affirmed February 4, 1941

## SIDDONS ET AL. *v.* LAUTERMAN

(109 P. (2d) 1049)

*Custer E. Ross* and *Asa Lewelling*, both of Salem (Ross & Ford and Asa Lewelling, all of Salem, on the brief), for appellant.

*Norman K. Winslow*, of Salem (W. C. Winslow, of Salem, on the brief), for respondents.

BAILEY, J. The defendant, J. H. Lauterman, appeals from a decree of the circuit court quieting title in the plaintiffs, Mary A. Siddons and Dan Siddons, her husband, to the following described real property:

"Beginning at a point on the west boundary line of the D. L. C. of L. G. Tuthill No. 42 in township 7 south, range 6 west of the Willamette meridian in Polk county, Oregon, 36.59 chains south from the northwest corner thereof; running thence east 3.05 chains; thence north 7° east 12 chains; thence west to the west boundary line of said Tuthill D. L. C.; thence south to the place of beginning, and containing approximately 4.5 acres."

The plaintiffs claim ownership of the property in suit through adverse possession for more than the statutory period, while the defendant asserts ownership of the record title in himself by mesne conveyance from the federal government. The only question here for decision is whether the plaintiffs have acquired ownership of the tract of land above described, or any part of it, by adverse possession, inasmuch as it is clear from the evidence before us that the record title to the disputed property is in the defendant.

The land here involved is an almost rectangular tract containing about four and one-half acres. It is intersected by a stream formerly known as La Creole creek and now named Rickreall creek, which flows in a northerly direction.

Shortly before this suit was instituted the plaintiffs entered into a contract to sell to A. E. Ullman a part of this disputed tract and other land lying between it and the highway, of which latter parcel, it is conceded, the plaintiffs were the owners. In preparing an abstract of the property agreed to be sold it was discovered that the record title to the disputed tract was in Lauterman. Thereupon this suit was instituted.

The facts in the case can best be understood by reference to the following map, copied from one made June 8, 1939, by the county surveyor of Polk county.

At the northeast corner of the tract in controversy is a witness tree bearing the letter S, so marked, apparently, to designate a point in the survey made by F. M. Suver. In 1912 Mr. Suver, as county sur-

veyor of Polk county, made a survey of the tract and other property north of it at the instance of the record owner of the title, Mrs. Boise, mother-in-law of the defendant. There is an angle in the east boundary line of the property as mapped by the surveyor, at the point where the witness tree is shown.

At or near the northwest corner of the disputed tract there was formerly a dam, used in connection with a woolen mill which had been burned in the eighteen-sixties and had not been rebuilt. The dam had been washed out many years prior to the time of the trial.

The west boundary line of the disputed tract coincides with the west line of the L. G. Tuthill donation land claim. The land to the west, south and east of this tract is owned by the plaintiffs, although some of it at the east side of the tract, abutting the highway, is designated on the map with the name of A. E. Ullman. The property directly north of the land in controversy is owned by the defendant.

During the trial, that part of the disputed land lying easterly of the creek was referred to as the picnic grounds, and that at the west of the creek as the garden spot, and for the purpose of distinguishing between them the two parts will be so mentioned in this opinion. The garden spot is cleared and for many years has been used as a pasture. On the picnic grounds are a few large trees and a great amount of brush. This latter area is reached from the highway by two or three unimproved roads, which cross the strip of land lying between it and the highway and undisputedly owned by the plaintiffs.

Mrs. Boise, mother-in-law of the defendant, died in 1919 and at that time was the record owner of approximately 368 acres of land, including the tract here in dispute. Upon her death, her daughter, wife of the defendant, became the record owner of property which included the tract here involved. Mrs. Lauterman died in 1935 and her husband, the defendant, succeeded her as such record owner.

The plaintiff Mary A. Siddons was born in 1869 on the Hallack home place, located about a quarter of a mile south of the disputed tract. Her parents had lived there since prior to 1865. Her father died in 1887 and her mother in 1917. The property on the east, south and west of the land in dispute had been owned by the parents of Mrs. Siddons since about 1865. Upon her mother's death, Mrs. Siddons inherited the real property owned by her.

Mrs. Siddons lived on the home place until 1898, when she moved to Dallas, where she resided until 1905. From that year until 1921 she lived away from Polk county, and in 1921 she returned to the home place, where she was living at the time of the trial.

According to the testimony of Mrs. Siddons, Mr. Robinson, her brother-in-law, who rented the home place from her mother, in 1886 fenced in a small plot of ground on the west side of the creek, within the disputed area, and used it as a garden for a year or two. Mr. Robinson's testimony, however, is to the effect that he moved onto the home place in the fall of 1890, put up a rail fence around the plat mentioned and had a garden there in 1891. From the fact that the garden was once there, all that part of the disputed tract lying west of the creek, and not merely the plot once fenced as a garden, has been referred to throughout the case as the "garden spot."

There is some evidence that there has been a fence along the west side of the creek from prior to 1890 until the present. The original fence, according to the testimony, ended at or near the place where the dam was formerly located. At that point on the west side of the creek there is a bluff, high enough to prevent livestock from going farther north along the creek. From 1924 a wire fence has been maintained and kept in repair along the west side of the stream to the dam site, apparently following the line of the earlier rail fence. There never has been any fence separating the whole garden spot area from the lands immediately west and south of it. It is clear from the entire record before us that from the early part of 1890 down to the date of the trial the garden spot, except the plot cultivated for a year or two, above mentioned, had been used as pasture, together with lands of the plaintiffs and their predecessors in interest.

Mr. Lauterman in 1912 assisted in surveying the west boundary of the garden spot, but he has not since that time been on that part of the disputed tract.

Mrs. Siddons testified that at the time of her earliest memory there was an old fence, then "in ruins", along the west side of the roadway, extending as far as the north boundary line of the picnic ground and from that point west to the site of the former dam. She further stated that her father had fenced the picnic ground for use as pasture.

Mr. Roy Bird, of Dallas, testified that his father rented the Hallack place in 1900. At that time, he stated, there was a log fence along the west side of the road, enclosing the picnic ground with the land immediately east of it, then owned by Mrs. Hallack,

mother of Mrs. Siddons; and that there were cross fences of logs and brush, from three to four feet high, from the roadway to the creek, at the north of the picnic ground and at the south end of the tract. The testimony of this witness indicates that the fence along the highway was built of logs and the cross fences were built of logs in part and ended with brush "from the log fence out to the creek bank."

The enclosed land was used by Mr. Bird's father for pasturing a mare and a colt which he did not want to turn in with other livestock. At the time this witness first saw the fence in 1900 it was moss-covered, and it disappeared sometime between 1904, when he left the Hallack place, and the date of the trial. During the time that Mr. Bird lived on the Hallack place the picnic ground was used by campers who "came and went at will".

The evidence does not clearly show what use was made of this part of the property from 1904 until about 1920, other than for camping. About 1920, after Mrs. Hallack's death, the plaintiffs leased the land between the road and the creek to Mr. Morris Dalton for an annual consideration, according to Mr. Dalton's recollection, of ten dollars. The written lease was not introduced in evidence, for the reason that the plaintiffs' copy had been lost in a fire which burned their home, and Mr. Dalton had destroyed his copy before the trial, without knowledge that the present litigation was contemplated. Both the plaintiffs and Mr. Dalton testified that the lease covered all or practically all the land between the road and the creek, including the picnic ground.

On the latter part of the leased land Mr. Dalton built a tent house with wood floors and sides and a

canvas top. The main part of it was twelve feet by twenty-four feet and the kitchen part was about six feet by eight. Outside the tent house he constructed a rock fireplace.

Mr. Dalton permitted other people to put up tent houses similar to his, on the leased premises, charging them annual rentals. He also charged admission to others who camped on the ground or used it for picnicking.

All the tent houses were built on the picnic ground except that of Mr. J. C. Tracy, which was a short distance south of it, close to the creek. Although the canvas tops of the tent houses were removed at the close of the camping season each year, the floors and frames were left on the property the year around, until about 1938.

Under his lease Mr. Dalton remained on the property eight or nine years; and after he left, this same parcel of land was occupied for two or three years by successive tenants, who charged picnickers and campers for admission to the ground.

During the summers of 1932 and 1933 A. H. Kliever worked for the plaintiffs on their farm and looked after collection of charges for temporary use of the picnic ground. About 1930 or 1931 painted tin signs were posted on trees near the highway, along the roads leading into the picnic ground. On one of the signs, introduced in evidence as an exhibit, was the following:

"Picnic Cars
25c

Camping
50c and up

Special rates by wk."

Numerous witnesses were called who had lived in the vicinity of this tract of land and were familiar with it. They testified that it had been generally understood in the community over a long period of time that Mr. and Mrs. Siddons owned the picnic ground and that permission to use it was to be had from them.

Archie Matlock testified that in 1922 he contracted with the Lautermans to cut the merchantable timber on the Lauterman property, and his negotiations were carried on with Mr. Lauterman. In pointing out the boundaries of the property, he stated, Mr. Lauterman designated the south boundary of his land as a line from the witness tree to the dam site. Mr. Matlock testified that he cut all the merchantable timber south to that line.

In this connection Mr. Lauterman testified that he had trouble with Matlock and terminated the contract before he cut trees as far south as that line; and that after the contract was terminated he hired some one else to cut trees for firewood south of the place where Matlock ceased working. According to his statement concerning the line up to which trees were removed, the cutting ''did not stop there for any particular reason'' except that he then had all the timber and wood he wanted.

During the two years from 1925 to 1927 Lester Martin occupied the Lauterman place under lease, and in showing the south boundary of the property to him, Martin testified, Lauterman indicated a line north of the picnic ground. This line was ''near the old dam site, or the end of the logging where the timber was cut. As far as the timber was cut.'' The line so pointed out to Mr. Martin extended ''from the county road to the creek.''

Mr. Siddons testified that Mr. Lauterman designated as the south boundary of his land a line from the witness tree to the dam site. This occurred about the time that he, Siddons, and his wife conveyed to G. M. Hawkins a tract of land east of the highway, in 1918. At that time Mr. Siddons was helping to survey for the purchaser the property conveyed.

Mr. Lauterman denied that he had pointed out to Matlock, Martin or Siddons the north line of the property in dispute as the south boundary of his land. He further testified that Mr. Siddons had never talked to him about the ownership of the land now in dispute and that he had never seen either Mr. or Mrs. Siddons on that land. He also stated that he had never seen along the highway the posted signs hereinabove described, and that he had not seen the tent houses or the platforms for them on the picnic ground. He testified that he had seen campers on the picnic ground and that campers also used his property farther down the stream and he had not disturbed any of them. He had, however, posted or caused to be posted a number of ''no trespass'' signs on his property farther down the stream, but did not know whether any such signs were posted on the property here in dispute.

Mr. Lauterman and his predecessors in interest had always paid the taxes on the tract in controversy, which was assessed to them along with other land to which they held the record title. It was not an easy matter, as would appear from the testimony of the county assessor of Polk county, to determine from the assessment rolls to whom this particular tract was assessed. The plaintiffs had called for their statement and paid their taxes each year, believing, they stated, that this property was assessed to them.

After the plaintiffs had contracted to sell to A. E. Ullman the land between the highway and the creek and discovered that they did not have the record title to the tract here in controversy, they came to Salem and saw Mr. Lauterman. Mrs. Siddons gave the following testimony concerning their conversation with him:

"Q. You did ask him to come over and go over the line with you? That is right, isn't it? A. We very likely did. I don't remember about that, whether we did or not. He talked very little with us; said he was very busy that day and didn't have time to talk to us."

Mr. Siddons testified that in their conversation with Mr. Lauterman he and his wife did not "ask him anything about the lines." His further testimony was as follows:

"Q. What did you talk to him about? A. We asked him how much he wanted.

"Q. Wanted for what? A. For that . . . I guess it is about four acres in there. Supposed to be. I guess from the looks of it it was supposed to take care of the back water of the old woolen mill dam.

"Q. And what did he tell you about how much he wanted? A. Why, he didn't tell us.

＊　　　＊　　　＊　　　＊　　　＊

"Q. Well, he said he didn't want to sell, didn't he? A. Well, he finally come up. Said he would be up, and finally come up there to the place and finally said he didn't want to sell, that there might be a gold mine down there and he didn't want to throw away any proposition like that."

Mr. Lauterman testified that he thought that the report of their conversation given by Mr. Siddons was correct, although he did not remember making the remark about "a gold mine".

The appellant questions in this court for the first time, as far as the record discloses, the sufficiency of the complaint. Paragraph III of that pleading alleges the following: "That plaintiffs are now and have been for upwards of forty years and in the open, exclusive, continuous, peaceful possession of, claiming as such owners, the following described real property to-wit", the tract here in suit. It is argued by the appellant that the complaint fails to allege "that the possession was hostile, adverse and actual".

■ Section 1-902 O. C. L. A. provides that "in the construction of a pleading for the purpose of determining its effect, its allegations shall be liberally construed, with a view of substantial justice between the parties." It has so often been held by this court that when the pleadings have not been tested by demurrer or motion, on appeal every reasonable inference or intendment should be invoked in aid thereof, that citation of authorities is not necessary. Throughout the proceedings in the circuit court there appears to have been no objection raised by the defendant as to the sufficiency of the complaint. The case was tried on the theory that the plaintiffs had acquired ownership of the tract of land in suit by adverse possession.

In *Anderson v. Richards,* 100 Or. 641, 198 P. 570, the complaint was attacked on the ground that it did not allege that the plaintiffs had been in exclusive possession. This court, after referring to a Nebraska decision to the effect that it was necessary to allege that the possession had been exclusive, stated: "But the better rule is believed to be that the element of exclusive possession may sufficiently appear from the use of other words."

■ The complaint before use is not a model pleading, but the defendant was not in any way misled as to the plaintiffs' claim. Upon construing the language of paragraph III hereinabove quoted and giving every reasonable intendment to the words "claiming as such owners" with reference to the remainder of the paragraph, it is our conclusion that the complaint is sufficient in face of the objection thereto raised for the first time in this court. To reverse the decree herein and remand the cause in order to allow the plaintiffs to correct an alleged defect in the complaint would serve no good purpose but would add to the expense and delay of litigation.

The judge who tried this case not only had the advantage of seeing and hearing the witnesses, but also made a personal inspection of the property in suit, which doubtless was helpful to him in understanding the explanations made by various witnesses as to what they had seen on different parts of the property.

■ The trial court found that the plaintiffs had established their ownership of the property by adverse possession, and in this we concur. It is not necessary to review again the evidence to which we have above directed attention. In arriving at the conclusion announced we have considered the payment of taxes on the disputed tract by the defendant, and in addition the conversation had between the plaintiffs and the defendant with regard to their paying him for the land. This offer of payment, as we construe it, was for the purpose of being able to give good title to Ullman without the necessity of bringing suit to quiet title, and "can not be construed as an admission of title in the defendant": *Manning v. Gregoire,* 97 Or. 394, 191 P. 657, 192 P. 406. Furthermore, although the payment

of taxes may be considered in determining a claim of title by adverse possession, since men of ordinary prudence do not neglect to pay taxes assessed against property they own (1 Am. Jur., Adverse Possession, § 245, payment of taxes is not a condition to the acquisition of title by adverse possession, unless made so by statute: 2 C. J. S., Adverse Possession, §171. And Oregon has no such statute.

■ The preponderance of the evidence establishes the plaintiffs' title to the disputed tract by adverse possession for the statutory period and more. The decree appealed from is affirmed. Neither party will recover costs in this court.

KELLY, C. J., and BELT and LUSK, JJ., concur.